1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL

UNITED STATES OF AMERICA,          )
                                   ) 1:08-cr-8  LJO
            Plaintiff,             )
                                   ) SENTENCING
      vs.                          )
                                   ) Testimony of Van Nakagawara
JARED JAMES DOOLEY,                )
                                   )
            Defendant.             )
_____    )

Fresno, California                 Friday, October 10, 2008


          REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Government:          **KAREN ESCOBAR**
                            Assistant U.S. Attorney
                            2500 Tulare Street, Rm. 4401
                            Fresno, California  93721

For the Defendant:          LAW OFFICES OF DAVID TORRES
                            1318 K Street
                            Bakersfield, CA  93301
                            BY:  **DAVID TORRES**

## INDEX

**GOVERNMENT'S WITNESSES**:

**VAN NAKAGAWARA**                                    4
DIRECT EXAMINATION BY MS. ESCOBAR                    4
VOIR DIRE EXAMINATION BY MR. TORRES                  6
FURTHER DIRECT EXAMINATION BY MS. ESCOBAR            9
CROSS-EXAMINATION BY MR. TORRES                     20

4

```
1    Friday, October 10, 2008              Fresno, California

2

3         *         *         *         *         *

4         MS. ESCOBAR:  Dr. Nakagawara.

5                   VAN NAKAGAWARA,

6    called as a witness on behalf of the Government, having been

7    first duly sworn, testified as follows:

8         THE COURT:  Please take the witness stand, if you

9    would, and then tell us your name.

10        THE WITNESS:  Good morning, I'm Van Nakagawara.

11                  DIRECT EXAMINATION

12   BY MS. ESCOBAR:

13   Q.  Would you state your occupation for the record?

14   A.  Yes.  I'm a research optometrist with the Federal Aviation

15   Administration, Civil Aerospace Medical Institute, in Oklahoma

16   City.

17   Q.  How long have you been employed?

18   A.  I started working with the FAA in 1986.  That's been a

19   little over 22 years.

20   Q.  Do you have experience in the impact of lasers on aviation

21   safety?

22   A.  Yes.  I have actually been working on laser issues for the

23   FAA since 1994.  I have been involved with the Society of

24   Automotive Engineers, Laser Safety Hazard Subcommittee, since

25   that time.  I have actually been the Vice-Chairman of that
```

1   group for a number of years, and now I'm currently the

2   Chairman.

3        I have actually worked with the American National

4   Standards Institute, which has a standard on outdoor lasers,

5   and I have been working with them for a couple of years, and

6   I'm now the secretary of that group.

7   **Q.** If you would, what is the nature of your training and

8   experience, in addition to those affiliations you have just

9   stated?

10  **A.** I'm sorry, I'm not sure what the question is.

11  **Q.** Your educational experience.

12  **A.** Oh, educational experience.  I'm a research op -- I'm an

13  optometrist.  I have actually worked -- also a member of the

14  American Optometric Association's Aviation Vision Committee.

15  I'm actually also been a part of the International Civil

16  Aviation Organization, which established laser safety

17  guidelines for the international community, aviation community

18  as well.

19       THE COURT:  Are you asking that the curriculum vitae

20  that you have provided to the Court be marked as an exhibit?

21       MS. ESCOBAR:  It can be marked.  I'm not necessarily

22  introducing it, but I would submit that he is qualified to

23  testify as an expert in the effect of lasers in aviation

24  safety, in relation to aviation safety.

25       MR. TORRES:  I will submit that issue to the Court.

1              THE COURT:  So you are not stipulating?

2              MR. TORRES:  No.

3              THE COURT:  Do you wish to voir dire him on that

4    limited issue?

5              MR. TORRES:  Very briefly.

6              THE COURT:  Okay.

7                        VOIR DIRE EXAMINATION

8    BY MR. TORRES:

9    Q.  With respect to the training, you testified that you have

10   been involved in laser type of research since 1984; is that

11   correct?

12   A.  That's correct -- 1986.

13   Q.  1986?

14   A.  1986, I'm sorry.

15             THE COURT:  Wait just a second.  You correct me if

16   I'm wrong.  I thought your testimony was that you have been a

17   research optometrist with FAA since '86, but with regards to

18   lasers --

19             THE WITNESS:  Since 1994.

20             THE COURT:  Thank you.

21             Go ahead.

22   BY MR. TORRES:

23   Q.  1994, okay.  The type of laser experience that you have

24   undergone initially, what was that?

25   A.  I have been familiar with lasers certainly as far as

1   medical lasers are concerned.

2   **Q.**   Okay.

3   **A.**   I use lasers, for example, for correcting refractive

4   surgery, for glaucoma treatments, et cetera.

5   **Q.**   And I have had an opportunity to review your curriculum

6   vitae, and I see you have done several articles with respect

7   to LASIK surgery, refractive surgery?

8   **A.**   Yes.

9   **Q.**   Have you ever been involved with any type of research

10  concerning military lasers?

11  **A.**   No, I have not.

12  **Q.**   Have you ever been involved with any type of research

13  concerning lasers or the detrimental effect of lasers?

14  **A.**   Yes, I have.

15  **Q.**   And that's in the course of your LASIK --

16  **A.**   No, no.  Actually, we actually looked at the effects of

17  LASIK refractive surgery regarding performance on pilots, but

18  we also have done some research looking at the effect of laser

19  lights on pilot performance.

20         We did a study in conjunction, actually, with the

21  military, looking at the effect of laser light on pilot

22  performance with a 727 Boeing simulator.

23  **Q.**   And do you recall what type of laser was used in that

24  particular scientific experience?

25  **A.**   It was YAG laser, green, 532 nanometer laser, similar to

8

1  the laser color that was used in this laser pointer incident.

2  **Q.**  Have you seen the particular laser in this case?

3  **A.**  No, I have not.

4  **Q.**  You have never physically observed it, have you?

5  **A.**  No, I have not.  The laser we are talking about with

6  regard to this incident here?

7  **Q.**  That's correct, sir.

8  **A.**  No.  I did see the report that was done by Wes Marshall's

9  group.

10  **Q.**  That would be the Maryland group?

11  **A.**  That's correct.

12  **Q.**  The Aberdeen Group?

13  **A.**  Yes.

14  **Q.**  With respect to that particular report that you saw,

15  Doctor -- well, strike that.

16       With respect to this particular laser, have you

17  personally performed any type of test with this particular

18  type of laser?

19  **A.**  No, I have not.

20  **Q.**  And when you also talk about the effects of lasers on

21  pilots with respect to LASIK and refractory type of

22  operations, we are talking the LASIK, which is a laser which

23  is at a very close distance; is that correct?

24  **A.**  That's correct, yes.

25  **Q.**  Sometimes an inch or less?

1  **A.**  Yes.  It's actually a laser that is used to modify the

2  cornea of the eye, and we were very much interested to see how

3  the effect that would have, that modification would have on

4  pilot performance.

5           MR. TORRES:  Thank you.  Your Honor, I'm prepared to

6  submit it to the Court at this time.

7           THE COURT:  The request by the U.S. attorney is

8  granted.

9                    FURTHER DIRECT EXAMINATION

10 BY MS. ESCOBAR:

11 **Q.**  Doctor, how do lasers affect aviation safety?

12 **A.**  Well, it can have a huge effect.  Since I have been

13 involved with it in 1994, primarily the concern was for these

14 demonstration lasers, these outdoor laser shows that were

15 occurring.  A lot of them were occurring in places like

16 entertainment venues, Las Vegas or in Mississippi in the

17 casino area, down in Biloxi, but these lasers were being

18 utilized to draw people into the casinos or into these

19 entertainment venues.

20           And at that time, the exposure levels could be as

21 long as you did not exceed the maximum permissible exposure

22 level for a laser, which is for biological damage, you can

23 actually shine a laser into the sky.  However, what they found

24 out is that people were being exposed to low levels of laser

25 exposure, well below the MPE or Maximum Permissible Exposure

1    for damage, and it actually resulted in visual performance

2    loss.  It could result actually in glare, flash blindness and

3    after image effects.

4    **Q.**  Specifically, with respect to the impact or the effect of

5    the laser illumination on pilots, what are some of the

6    problems associated with the illumination of an aircraft?

7    **A.**  Well, it can be a very serious thing, I mean especially

8    when the pilot is in a critical phase of flight.  Somewhere

9    about 10,000 feet above the ground, it is a sterile cockpit

10   environment, there is no communication going on because they

11   want to focus in on the approach or landing of the aircraft

12   itself.

13          So we have actually tried to protect the pilot from

14   exposures and we have actually established zones around an

15   airport to limit the exposure level to a pilot during those

16   critical phases of flight.

17   **Q.**  Was the phase of flight in this case -- you heard the

18   testimony of the pilot.  He was at 500 feet.  Was that a

19   sensitive zone?

20   **A.**  At 500 feet, and he wasn't considered to be in any kind of

21   a zone because he wasn't near the airport, I don't believe.

22   But if he had been near an airport, he would have been in a

23   laser-free zone, and that level of exposure is quite low,

24   somewhere about 50 nanowatts per centimeter squared, according

25   to the FAA order we have.

1  **Q.** In the laser-free zone, what is considered critical in

2  terms of laser exposure?

3  **A.** Like I said, it is at 50 nanowatts per centimeter squared.

4  The zone itself is two miles from each side of the runway, the

5  center of the runway.  It is actually three miles beyond the

6  extension of the runway itself, and it extends up to 2,000

7  feet above the ground.

8  **Q.** So the pilot here was at 500 feet?

9  **A.** That's correct.

10 **Q.** With his exposure by the green laser involved, do you

11 agree with Wesley Marshall, who prepared a report which is

12 attached to the government's response, that that would have

13 posed a potential problem to the pilot?

14 **A.** Yes.  I think so.  I have known Wesley Marshall since the

15 very beginning of working with lasers, since 1994.  He is one

16 of the foremost experts on lasers and was a former Chairman of

17 the ANSI Z136.6 Committee, American National Standards

18 Institute.

19        And I think according to his report that came from

20 his group, the laser itself was hazardous.  That's why it has

21 a "Danger" located on its -- on the laser itself, and which

22 means --

23        MR. TORRES:  Objection, speculation, your Honor.

24        THE COURT:  Sustained.  No foundation for that

25 statement.

1          MS. ESCOBAR:  Your Honor, he has reviewed the report,

2    which contains the information pertaining to the laser.

3          THE COURT:  He is going to have to testify to that.

4    BY MS. ESCOBAR:

5    Q.  Have you reviewed Wesley Marshall's report?

6    A.  Yes, I have.

7    Q.  His examination of the laser?

8    A.  Yes.

9    Q.  The specific laser that was used in this case?

10   A.  Yes.

11   Q.  And he characterized the laser as a Class 3A laser?

12   A.  That's correct.

13   Q.  What does that mean?

14   A.  It means that it's below 5 milliwatts of power.

15   Q.  And what does that mean in terms of potential impact on

16   the -- on vision?

17   A.  If you are -- if you have an illumination that can exceed

18   the MPE, if it is less than 2.5 microwatts per centimeter

19   squared for a quarter-second duration, you can have a caution

20   level on it, a label on it.

21          If it exceeds that, which means that you can actually

22   cause some sort of damage to the eye, that's the reason they

23   put a "Danger" sign on it.  That's the reason it has a

24   "Danger" on the laser itself.

25          MS. ESCOBAR:  For the record, the exhibit was

1  attached to the government's response as Government's Exhibit

2  D, which contains a photograph at Bates stamp -- the

3  photograph didn't -- my copy is not so hot, but it's at Bates

4  stamp 176.  And it does have --

5  BY MS. ESCOBAR:

6  **Q.**  It has a danger label right on the laser?

7  **A.**  Yes, yes.

8  **Q.**  And based upon the information, based upon the report and

9  the information known to you regarding this case, was this a

10  dangerous situation for the pilot?

11  **A.**  Well, the thing about it is that the pilot was at a very

12  low level.  That's always dangerous.  Some of our experience

13  reading different reports that have occurred, certainly people

14  at low levels of flight altitude can be a real problem,

15  because you don't have much room for making some sort of

16  compensatory maneuver, and you are low to the ground.  You

17  certainly could hit something or something flying around.  You

18  are trying to be vigilant, trying to see and avoid, and that

19  could be compromised.

20        MR. TORRES:  I object to the last response, it's

21  nonresponsive, speculative.  Move to strike.

22        THE COURT:  The last portion was not responsive to

23  the question that was asked, and it is stricken on that ground

24  only.

25  ///

1   BY MS. ESCOBAR:

2   **Q.**  The aircraft involved was a helicopter.  Does the lasering

3   of a helicopter, is that more problematic?

4          THE COURT:  Than what?

5          MS. ESCOBAR:  Than a general aircraft.

6   BY MS. ESCOBAR:

7   **Q.**  A 747, for example.

8   **A.**  Well, a helicopter can be more of a problem, primarily

9   because it's usually hovering low to the ground.  And any time

10  the aircraft is low to the ground, you are going to have some

11  issues with that.  And from our reports that we have seen,

12  there have been numerous incidences in which helicopters have

13  been hit by lasers, both in -- both by the, I guess sheriff

14  department or police helicopters as well as Medivac

15  helicopters as well.

16  **Q.**  Has it been a pervasive problem, the lasering of law

17  enforcement aircraft?

18  **A.**  The number of incidents have increased dramatically.  We

19  have had somewhere close to a 900 percent increase since 2004

20  to 2006, at least that's what our data is showing, and a lot

21  of those are occurring in the Western Pacific Region, which

22  is -- includes California, Nevada, Arizona and Hawaii.

23          MR. TORRES:  Your Honor, I'm going to object to that

24  last, with respect to the percentage or the percentage based

25  on foundation and speculation.  There may have been a variety

1   of other types of incidents that were studying at the time.

2           THE COURT:  The objection on foundation is held in

3   abeyance pending this next question and answer, laying the

4   foundation of how he knows.

5   BY MS. ESCOBAR:

6   **Q.**  Are pilots required to submit reports to the FAA when they

7   have been lasered?

8   **A.**  There is actually an advisory circulative that was

9   established in January 2005 in which pilots are asked to

10  submit in a report on lasers when they have been lasered or

11  illuminated by a laser.

12  **Q.**  Your data concerning the pervasiveness of laser

13  illuminations is based specifically on the reports generated

14  by the pilots?

15  **A.**  Yeah.

16  **Q.**  Or the airports?

17  **A.**  They may come from airports, they may come from Internet

18  sources as well.  We try to collect all of the data from a

19  variety of different sources.

20          THE COURT:  Overruled.

21  BY MS. ESCOBAR:

22  **Q.**  Does your --

23          THE COURT:  The objection is overruled.

24  BY MS. ESCOBAR:

25  **Q.**  Does your data indicate that the incidents of laser

1  illuminations is higher in the Western portion of the United

2  States?

3  **A.**   Yes.   The Western Region is most prevalent.

4  **Q.**   Significantly higher in the Western Region?

5  **A.**   Yes, it is.

6  **Q.**   And California is higher than the other Western states?

7  **A.**   That's correct.

8  **Q.**   The -- back to the problems posed when a helicopter is

9  lasered, is there anything unique about the shape or

10 configuration of the window that would increase the trauma to

11 the eye of a pilot driving a helicopter?

12 **A.**   A helicopter usually has like a bubble type of canopy,

13 and, you know, so there is more level of exposure to the light

14 itself.   You can have scattering that occurs when the laser

15 light hits the canopy or windshield.

16         You also have scattering occurred which can affect

17 vision performance when you hit like optometric lenses, like

18 glasses, or if it goes into the eye, if you have any cataract

19 or opacities in the lens or in the cornea of the eye itself,

20 which can result in vision performance losses.

21         So because of the canopy itself, yes, it can be an

22 issue, yes.

23 **Q.**   And the fact that the pilot's partner in this case was

24 wearing night vision goggles, how does -- would the green

25 laser illumination have affected him?

1   **A**.  Well, green laser light is -- has much stronger effect on

2   human -- the human eye.  The eye is somewhere about 30 to 35

3   times more sensitive to green light than it is to red light.

4   With a night vision goggle, what happens is that there is a

5   light application system, so when the night vision goggle is

6   hit by light, it would actually bloom up, and it can be -- so

7   it can be very intense as far as the exposure is concerned.

8           MR. TORRES:  Excuse me.  Objection, your Honor.

9   Foundation, speculation as to whether or not that particular

10  night device was being worn by the other individual.

11          MS. ESCOBAR:  Your Honor, the pilot testified that

12  his partner was wearing night vision goggles.

13          THE COURT:  I understand.

14          What?

15          MR. TORRES:  There are different types of night

16  observation devices, and the question is whether or not he was

17  actually wearing the type that he has testified to.

18          THE COURT:  I don't think that the question was that

19  specific.  The objection is overruled.  But you can certainly

20  take care of that on cross-examination.

21  BY MS. ESCOBAR:

22  **Q**.  So is it your opinion that the wearing of night vision

23  goggles can worsen the effect of exposure to green laser?

24  **A**.  From what I have read and what I have studied, yes, it can

25  be a real issue.  It has been an issue in the past.

1      Certainly, that's one -- I think one of the things

2  that was occurring was that in Desert Storm, lasers were

3  actually used against our helicopter pilots that were using

4  night vision goggles.

5  **Q.**  Is the use of laser generally a problem that has been

6  recognized and discussed at the legislative level with respect

7  to the use of a laser as a dangerous weapon?

8  **A.**  Well, there was actually testimony before Congress by the

9  Deputy Administrator, Nick Sabatini, several years ago.  So

10  it's been something that's been studied by Congress as well.

11  **Q.**  And have other countries taken measures with respect to --

12  or recognized the danger of the use of lasers as a weapon?

13  **A.**  Well, recently, I think in Australia, they have identified

14  lasers in one of the provinces there as a lethal weapon.  And

15  they are actually trying to control now the importation of

16  laser pointers into the country.

17      So the -- unfortunately, the laser pointer incidences

18  are increasing internationally, certainly in Canada,

19  Australia, and in the UK.

20  **Q.**  Based upon your review of Wesley Marshall's report, and

21  which contains a discussion of the facts in this case, what is

22  your opinion concerning the impact of the green laser used on

23  the pilot and his passenger in this case?

24  **A.**  According to Wesley Marshall's analysis, this laser

25  pointer would have exceeded the critical flight zone exposure

1   level up to about 2,000 feet.  And the pilot himself was

2   actually flying at 500 feet, so he was well within the

3   critical flight zone exposure level, probably much more so

4   than that, but at a very low level, actually at the laser-free

5   zone level.

6   Q.  Did that create an aviation hazard?

7           MR. TORRES:  Excuse me.  I want -- objection, your

8   Honor, with respect to the last response.  Speculation and

9   foundation.

10           THE COURT:  Overruled.  It goes to the weight and not

11   the admissibility.

12   BY MS. ESCOBAR:

13   Q.  Did that create an aviation or pose an aviation hazard?

14   A.  That could potentially, yes, pose a serious hazard.

15   Q.  And specifically, what sort of hazard?

16   A.  Well, you could have -- we have had reports of pilots that

17   have been exposed to laser lights, similar to these, with

18   laser pointers.  They have actually reported shielding their

19   eyes.  They have actually lost vision where they couldn't see

20   the runway or the instrument panel.

21           We have had reports of people actually giving up

22   control of the aircraft to another pilot because they were

23   incapacitated.  There have actually been reports of people not

24   being able to -- you know, perceptual loss, which resulted in

25   performance loss.

1     MS. ESCOBAR:  Thank you.  I have no further

2   questions.

3     THE COURT:  Cross?

4                   CROSS-EXAMINATION

5   BY MR. TORRES:

6   Q.  Doctor, the testimony that you just gave, was that based

7   upon a report?

8   A.  Yes.  Several reports that we have made.  Correct, yes.

9   Q.  Earlier, I was asking, I made an objection with respect to

10   the night observation devices, correct?

11   A.  Yes.

12   Q.  And, again, having looked at your curriculum vitae, you

13   have had an opportunity to study -- well, you are familiar

14   with night observation devices?

15   A.  Some, yes.

16   Q.  Would it be fair to say that the night observation devices

17   in Desert Storm are certainly obsolete with respect to the

18   type they are using now?

19   A.  Probably, yes.

20   Q.  And when you talked about a certain light hitting these

21   night observation devices, there were some back in the day

22   that would basically -- I don't want to say explode, but they

23   would be rendered useless as a result of light being pointed

24   into them, correct?

25   A.  Correct.

1  **Q.** And these days, night observation devices have a lot --
2  are a lot more specialized, they are a lot more sophisticated?
3  **A.** I'm really not that familiar with the new current night
4  vision goggle systems.
5  **Q.** So would it be fair to say that the gentleman that was
6  wearing -- you did not have an opportunity --
7  **A.** No.
8  **Q.** -- to review his night devices?
9  **A.** No.
10       MR. TORRES:  Okay.
11 BY MR. TORRES:
12 **Q.** Doctor, did you personally have an opportunity to conduct
13 an examination of Deputy Ely?
14 **A.** No, I did not.
15 **Q.** Did you review any medical reports concerning this -- the
16 pain and discomfort that he sustained?
17 **A.** No, I did not.
18 **Q.** With respect to the other pilot, the other individual that
19 was with him, did you review any reports of his?
20 **A.** No, I did not.
21       MR. TORRES:  Okay.  Your Honor, I have no further
22 questions.
23              *          *          *          *
24       (The proceedings were concluded at 12:00 p.m.)
25

22

1

2

3          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

4   certify the foregoing transcript as true and correct.

5

6   Dated:  07/29/2009                    /s/ Peggy J. Crawford
                                          PEGGY J. CRAWFORD, RDR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25